UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LATISHA CALLOWAY,

      Plaintiff

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

Civil Action No. 18-11274

HON. ARTHUR J. TARNOW
U.S. District Court Judge
HON. R.  STEVEN WHALEN
U.S. Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff Latisha Calloway ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).   For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #20] be GRANTED, and that Plaintiff's Amended Motion for Summary Judgment [Docket #16] be DENIED.

## I.  PROCEDURAL HISTORY

On July 15, 2015, Plaintiff filed an application for SSI, alleging disability as of

-1-

August 31, 2013[1] (Tr. 200). After the initial denial of the present claim, Plaintiff requested an administrative hearing, held in Oak Park, Michigan before Administrative Law Judge ("ALJ") Timothy J. Christensen (Tr. 56).  Plaintiff, represented by attorney Andrea Hamm, testified (Tr. 61-77), as did Vocational Expert ("VE") Scott B. Silver (Tr. 77-80).  On June 28, 2017, ALJ Christensen found that Plaintiff was not disabled (Tr. 18-30).  On February 28, 2018 the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the final decision on April 23, 2018.

## II.  BACKGROUND FACTS

Plaintiff, born December 26, 1970, was 46 when the ALJ issued his decision (Tr. 51, 200).  She completed 11th grade and worked as a housekeeper at a Residence Inn (Tr. 224).  She alleges disability due to Post Traumatic Stress Disorder ("PTSD"), chronic pain, rheumatoid arthritis, anxiety, depression, nerve damage, hypertension, and bipolar disorder (Tr. 222).

### A.     Plaintiff's Testimony

*Prior to Plaintiff's testimony the ALJ found that Plaintiff's former work activity as stated in her application for benefits did not rise to the level of Substantial Gainful*

---

[1]

Plaintiff made two prior unsuccessful applications for benefits, the more recent one denied on August 30, 2013 (Tr. 42, 82-94, 95-113).  While Plaintiff alleged disability as of August 31, 2013, the alleged onset of disability ("AOD") was later amended to the date of her latest application (Tr. 50-51).  *See* 20 C.F.R. § 416.335 (for SSI claims, "the earliest month for which we can pay you benefits is the month following the month you filed the application.")

*Activity* (Tr. 61).

Plaintiff then offered the following testimony:

She did not attend school after 11th grade (Tr. 61). She received gunshot wounds in 2008 (Tr. 61). She was currently receiving both mental health treatment and treatment for physical problems (Tr. 61). She stood 5' 5" and weighed around 213 pounds (Tr. 62). Her weight fluctuated due to her eating habits and medication (Tr. 62). She had lived with her mother since 2008 (Tr. 62). Her 24-year-old daughter lived with them (Tr. 63).

Plaintiff was able to care for her personal needs (Tr. 63). Her medication caused her to sleep most of the day (Tr. 63). The sleepiness was caused by a combination of Seroquel and Viibryd (prescribed respectively for nightmares about the shooting and depression) and opiates (Tr. 64). She typically fell asleep after eating breakfast (Tr. 65). She relied on her daughter to perform laundry chores but was able to fold her own clothes (Tr. 65). She experienced "a phobia" about leaving the house since experiencing a panic attack resulting from the shooting (Tr. 65).

Plaintiff experienced good results from mental health counseling while in jail and continued to receive treatment after being released (Tr. 65). At the time of the hearing, she received mental health treatment once a month and pain management treatment once every two months (Tr. 66). While at home, she did not sit on either the front or back porch due to her fear of being shot (Tr. 67).

Plaintiff's worst physical problem was right knee limitations due to a bullet wound

-3-

and arthritis (Tr. 67-68).  She experienced "unbearable pain" when not taking medication (Tr. 68).  She could walk but not run, adding that she was able to walk one block before experiencing severe knee pain (Tr. 68-69).  Her pain was eased by propping her right leg up to hip level (Tr. 69).  She was unable to sit for more than 30 minutes due to back pain (Tr. 69-70).  After sitting for half an hour, she was required to recline for two hours (Tr. 70).  Her back pain, also due to a gunshot wound, was not as bad as the knee pain but created left upper extremity limitations (Tr. 71).  She was unable to lift more than five pounds with the left arm (Tr. 71).  She was unable to stand for more than 10 minutes at a time due to back and knee pain (Tr. 71).

Plaintiff socialized with her daughter and sister (Tr. 72).  Due to the medication side effect of sleepiness, Plaintiff was unable to focus for the length of a 30-minute television program (Tr. 72).  She was able to watch a movie but was prone to falling asleep before the end, adding that she typically recorded movies for later viewing (Tr. 73).  She did not experience problems falling asleep at night but before starting Seroquel, experienced nightmares (Tr. 73-74).  She also experienced daily headaches lasting for up to a few hours (Tr. 75).  In response to questioning by the ALJ, Plaintiff testified that her doctors were aware of her daily headaches and that she spent approximately 17 daytime hours sleeping every day (Tr. 76-77).

### B. Medical Evidence[2]

### 1. Treating Sources

February, 2015 records by University Pain Clinic note Plaintiff's report of low back and buttock pain since sustaining gunshot wounds in 2008 (Tr. 303).  On a scale of one to ten, Plaintiff reported level "six" pain at the time of the examination and a maximum of level "ten" pain (Tr. 303).  She exhibited normal judgment, mood, and affect (Tr. 304).  Plaintiff reported that she was not interested in more aggressive treatment (Tr. 306).  She denied medication side effects (Tr. 307).  She denied fatigue or sleeping problems but reported anxiety and depression (Tr. 308).  In April and June, 2015 Plaintiff again denied medication side effects (Tr. 310, 313).  She appeared fully oriented (Tr. 311, 315).

June, 2015 records by psychiatrist John Head, D.O. note that Plaintiff spent two years in prison for assault during which time she was diagnosed with PTSD, depression, and anxiety (Tr. 453).  He assigned her a GAF of 46 due to depression, PTSD, and educational, occupational, social, and legal problems[3] (Tr. 453).  Counseling sessions from the same month note that Plaintiff was fully oriented with a cooperative manner and clear speech (Tr.

_____

[2]Records predating the amended AOD of July 15, 2015 are included for background purposes only.

[3]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.  *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000) ("*DSM-IV-TR*"), 34.

433). July, 2015 physical treating records note a normal range of motion and normal neurological and psychological examinations (Tr. 463). Plaintiff reported that her primary concern was hypertension (Tr. 462). Dr. Head's August and September, 2015 records note her report of "no complaints" or medication side effects (Tr. 403, 411). Dr. Head's October, 2015 records note complaints of "racing thoughts" but no side effects (Tr. 397). Physical treating records from the following month note that Plaintiff was scheduled for a partial hysterectomy (Tr. 469). Physical and psychological examinations were unremarkable (Tr. 470). In November and December, 2015, Plaintiff again denied medication side effects or psychological symptoms (Tr. 381, 389). Physical treating records from the same month note normal strength and movement and unremarkable neurological and psychiatric examinations (Tr. 473).

January, 2016 pain management records note that a straight leg raise test was negative (Tr. 536). Plaintiff demonstrated a normal gait and was "fully awake, alert, appropriate, and talkative" (Tr. 536). She report level "five" pain (Tr. 535). Dr. Head's January and February, 2016 records note no medication side effects or symptoms (Tr. 363, 373). March, 2016 pain management records note that lower back and right knee pain was improved with medication (Tr. 526). Plaintiff denied medication side effects (Tr. 526). Dr. Head's April, 2016 note her report of "hearing voices" (Tr. 350). His records from later the same month note that Plaintiff had no complaints, side effects, or symptoms (Tr. 341). In May, 2016, Dr. Head assigned Plaintiff a GAF of 50 due to depression, PTSD, and educational, occupational,

social, and legal stressors (Tr. 331).  He noted that Plaintiff had a 25-year history of marijuana abuse (Tr. 331).  A medication review from the same month noted "no complaints," "no symptoms," and a denial of medication side effects (Tr. 332).

April and July, 2016 treating records note normal movement and normal neurological and psychiatric examinations (Tr. 475, 477).  October, 2016 physical treating records  note a normal range of motion and a normal neurological examination (Tr. 479, 483).  January, 2017 records note a full range of motion in all extremities and a normal neurological examination (Tr. 486).  Plaintiff complained of headaches due to the use of Norvasc (Tr. 485).  Pain management records from the same month note that pain interfered with her daily activities but that she did not experience medication side effects (Tr. 518). She declined a recommended CAT scan, stating that she was not interested in surgery (Tr. 518).  She requested a right knee injection, noting that the knee pain was worse in cold weather (Tr. 518).  February, 2017 physical treating records also note Plaintiff's report of headaches due to the use of Norvasc (Tr. 492). A knee injection was performed without complications in March, 2017 (Tr. 504).

In March, 2017, Dr. Head composed a letter on behalf of the Plaintiff's application for SSI, opining that she was "unable to work due to her chronic mental health symptoms" (Tr. 566).

## 2.  Consultative and Non-Examining Sources

In October, 2015, Julia A. Czarnecki, M.A., LLP, under the direction of Nick

Boneff, Ph.D, performed a consultative psychological examination (Tr. 324-328) noting Plaintiff's report that she underwent three years of physical therapy following the 2008 shooting but continued to experienced lower back and buttocks pain (Tr. 324).  Plaintiff reported that she was taken to an emergency room in 2012 after experiencing a panic attack (Tr. 324).  She denied episodes of self harm or inpatient psychiatric treatment (Tr. 324).  She reported that anxiety was managed with medication (Tr. 324).  Plaintiff reported that she was able to care for her personal needs and interacted well with her family (Tr. 325).

Czarnecki observed that Plaintiff was dressed appropriately but smelled of alcohol despite the denial of recent alcohol use (Tr. 325).  Plaintiff exhibited a dull affect with a serious mood (Tr. 325).  Czarnecki concluded that Plaintiff did not experience concentrational limitations prohibiting unskilled work and that symptoms of PTSD were "resolved and managed with medication" (Tr. 326).

Later the same month, Joe DeLoach, Ph.D. performed a non-examining review of the treating records on behalf of the SSA, finding that Plaintiff experienced mild limitation in activities of daily living; no difficulty in social functioning; and moderate limitation in concentration, persistence, or pace (Tr. 128).  He concluded that she could perform "simple tasks on a sustained basis" (Tr. 133).

### C.  Vocational Expert Testimony

The ALJ described a hypothetical individual of Plaintiff's age, education, and (lack of) past relevant work:

This individual is limited to sedentary work; would require a sit/stand option, but by exercising that option would be off task less than ten percent of any given workday[4] [].  Postural activities could be done occasionally; however, no climbing of ladders, ropes, and scaffolds.  Should avoid performing activities requiring the use of upper extremities above shoulder level; avoid concentrated exposure to hazards.  This individual is capable of understanding remembering, and executing tasks commensurate with unskilled work . . .to learned by demonstration of 30 days or less.  Would there be any work that individual could do? (Tr. 77-78).

VE Silver stated that the above limitations would allow for the sedentary/unskilled work of an order clerk (212,000 positions in the national economy); addresser (104,000); and bench assembler (277,000) (Tr. 78).  The VE testified that  if the same individual required unscheduled work breaks throughout the workday with the need to recline for more than 20 percent of the workday, all competitive employment would be eliminated (Tr. 79).   In response to questioning by Plaintiff's attorney, the VE testified that the need to elevate one leg to hip level while sitting would also eliminate all competitive employment (Tr. 79).

**D.  The ALJ's Decision**

Citing the medical transcript, ALJ Christensen found that for the period under consideration, Plaintiff experienced the severe impairments of "status post gunshot wound to the left shoulder, left buttock, and right leg; degenerative joint disease; and affective

---

[4]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

disorder" but that none of the  conditions met or medically equaled an impairment found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 44).

The ALJ determined that for the period subsequent to the August 30, 2013 determination, Plaintiff presented evidence of "a new affective disorder" (Tr. 47).  He found that she experienced mild restriction in understanding, remembering, or applying information and adapting or managing herself and moderate limitation in interacting with others and in concentration, persistence, or pace (Tr. 45).

The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for sedentary work with the following additional limitations:

> [She] requires a sit/stand option, provided that the claimant is off-task less than 10 percent of the workday.  The claimant is able to perform postural activities only occasionally but must avoid climbing ladders, ropes, or scaffolds.  The claimant is able to perform work that does not require any use of the upper extremities above shoulder level.  The claimant must avoid concentrated exposure to hazards.  She is able to understand, remember, and execute tasks with an [Specific Vocational Preparation] skill level of 1 to 2, defined as occupations that can be learned by demonstration only or that can be learned within 30 days or less (Tr. 46).

Citing the VE's testimony, the ALJ found Plaintiff could perform the jobs of order clerk, addresser, and bench assembler (Tr. 50, 78).

The ALJ discounted Plaintiff's allegations of disability.  He noted that in September, 2014, she denied headaches or the need for pain medication (Tr. 47).  He noted that Plaintiff exhibited a normal range of motion (Tr. 47).  He cited records noting "chronic pain medication abuse" and Plaintiff's denial of medication side effects (Tr. 47).  He noted that

Plaintiff exhibited good balance and gait (Tr. 48).  He noted that Plaintiff did not report headaches until January, 2017 which apparently subsided after her medication was suspended for a month (Tr. 48).

As to the mental health treating records, the ALJ noted that Plaintiff reported good results from psychotropic medication (Tr. 48).  He acknowledged that in May, 2016, Plaintiff was diagnosed with "major depressive disorder, recurrent" with psychosis but noted that Plaintiff self-report of severe symptomology was contradicted by her report to treating sources from the same month that she was "feeling good" and did not experience medication side effects (Tr. 48).  He cited October, 2015 consultative evaluation records stating that she denied hallucinations (Tr. 48).  He accorded "little weight" to Dr. Head's March, 2017 opinion that Plaintiff was unable to work (Tr. 49).

### III.  STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted).   The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  *Biestek* at 139 S. Ct. at1152; 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a scintilla

of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*). Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).   However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS[5]

### A.  Recontacting a Treating Source

Plaintiff takes issue with the ALJ's rejection of a March, 2017 GAF of 50 assigned by a mental health counselor.   *Plaintiff's Brief,* 6-8, *Docket #16,* Pg ID 650 (*citing* Tr. 49, 548).  She faults the ALJ's finding that the record fails to show the basis for a GAF of 50, arguing that in the instance that a report "does not appear to be based on medically acceptable clinical and/or laboratory diagnostic techniques," the ALJ is required to recontact the treating source for clarification.  *Id.* at 6 (*citing* 20 C.F.R. § § 404.1512(e)(1), 416.912).

---

[5]Any issue not raised directly by Plaintiff is deemed waived. *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002).

The regulations cited by Plaintiff were no longer in effect at the time the ALJ made his determination. *See Hollis v. Comm'r of Soc. Sec.*, 2015 WL 357133, at \*23 (E.D. Mich. Jan. 27, 2015); § § 404.1512(e); 416.912(e). Under the current regulations, if the evidence is deemed "inconsistent" or "insufficient," the decision to re-contact a treating source is within the discretion of the ALJ. § 404.1520b(b)(2); § 416.920b(b)(1-2). "[I]f the record contains sufficient evidence" to make a determination, "recontacting sources is unnecessary." *Hollis* at \*23.

The ALJ did not err in declining to recontact the mental health care provider. The ALJ declined to accord "significant weight" to the March, 2017 GAF of 50 due to the conditions of major depression with recurrent and severe psychosis and PTSD, noting that the record "fails to show the mental status exam that these diagnoses were based on . . ." (Tr. 49). He noted that the assessment was inconsistent with earlier psychiatric evaluations" indicating that Plaintiff did not experience psychological symptoms (Tr. 49). The ALJ noted that the treatment records from the last half of 2015 forward showed that Plaintiff obtained good relief with medication, did not experience medication side effects, and that symptoms of PTSD were resolved (Tr. 48). Before a treating source may be recontacted to resolve inconsistencies or supplement insufficient evidence under § 416.920b(b)(2), the ALJ considers "the relevant evidence [to] see if" a disability determination can be made on the evidence already in the record. 416.920b(b)(1)(before seeking additional evidence, "we will consider the relevant evidence and see if we can determine whether you are disabled based

-14-

on the evidence we have").

Although the March, 2017 GAF showing "serious" psychological limitation was inconsistent with the treating records showing an unremarkable mental status, the ALJ did not err in determining that substantial evidence overwhelmingly supported a lesser degree of psychological limitation.   Consistent with the requirements of § 1520b(1), the ALJ was able to weigh the conflicting accounts and support his determination with substantial evidence without recontacting the treating source.

The ALJ's findings are also consistent with my own review of the physical and mental heath treating and consultative records noting a cooperative manner, full orientation, denial of side effects, and an appropriate affect (Tr. 332, 341, 363, 373, 397, 403, 433, 463, 470, 473,  477, 518, 536).  Because the record contained sufficient evidence on which to make determination, the ALJ was not required to recontact Plaintiff' mental health care providers.

## B.  An Updated Physical Examination

Plaintiff points out that she was not scheduled for a physical examination on the present application for benefits, arguing that the ALJ erred by failing to order an updated consultative examination for a renewed evaluation of her physical problems. *Plaintiff's Brief* at 8-9.

"An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)(" 'If your medical sources cannot or will not give us sufficient medical evidence about

-15-

your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests'"); *see also Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986)(ALJ authorized to order additional testing "*if* the existing medical sources do not contain sufficient evidence to make a determination")(emphasis added). Under § 416.919a, an ALJ may order a consultative examination is she or he (a) "cannot get the information" required "from [the] medical sources." However, "[b]efore  purchasing a consultative examination, [the ALJ] will consider not only existing medical reports, but also the disability interview form containing [the] allegations as well as other pertinent evidence in [the] file." Examples of instances where a consultative examination is required include the need for evidence not found in the treating source records, the death or non-cooperation of a treating source, or the need for "highly technical or specialized medical evidence" not in the record. § 416.919a(b).

None the instances listed in § 416.919(b) apply here. Plaintiff's treating sources for the physical conditions provided a plethora of records including repeated assessments of Plaintiff's neurologic and musculoskeletal conditions. The treating records show a full range of motion and strength and the absence of neurologic abnormalities (Tr. 470, 473, 479, 518, 535, 526 536). Plaintiff has not demonstrated that a consultative examination would clarify the long-term, comprehensive findings by her treating sources.

Further, the treating source evidence showing some degree of limitation in activities of daily living due to back and knee pain is adequately accounted for in the RFC for

sedentary work, a sit/stand option, and only occasional postural activity (Tr. 46). The determination that Plaintiff did not experience disabling limitation is also supported by her disinclination to pursue more aggressive treatment despite the fact that she was able to secure frequent and regular care. *See* SSR 16-3p, 2017 WL 5180304, at *8 (2017)(disability allegations may be discounted where "frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints"). In February, 2015, Plaintiff stated that she was not interested in more aggressive treatment notwithstanding her report that she experienced up to level "ten" pain (Tr. 303). In January, 2017, she declined a recommended CT scan despite that positive imaging studies would have supported her claim for benefits (Tr. 518). Given the presence of sufficient evidence for the relevant period, the ALJ was not required to order an additional examination.

While Plaintiff also contends that the ALJ erred at Step Three of his analysis by failing to obtain medical opinion in determining that she did not medically equal a listed impairment, this argument fails for multiple reasons. First, under SSR 17-2p, an ALJ may find that a claimant does not medically equal a listed impairment without the support of a medical opinion:

> If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain ME evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment. SSR 17-2p, 2017 WL 3928306, at *4 (March 27, 2017).

Plaintiff's argument appears to be based on a now-rescinded Ruling. SSR 96-6p, in which

a medical opinion was required on the issue of equivalency, "was rescinded and replaced by SSR 17-2p" which states that "the ALJ is not required to obtain medical expert evidence regarding equivalence ... if the [he] 'believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment.'" *Holmes v. Commissioner of Social Security*, 2018 WL 3544902, at *3 (N.D. Ohio July 24, 2018); SSR 96-6p, 1996 WL 374180 (July 2, 1996); SSR 17-2p at *4. Notably here, Plaintiff fails to present any theory as to how her conditions met or medically equaled a listed impairment at Step Three of the disability analysis.

Thus, Plaintiff's claim of error regarding the need for an additional consultative examination or for a medical opinion on the issue of equivalence does not provide grounds for remand.

### C. The Non-Severe Impairments

Finally, Plaintiff argues that the ALJ erred by omitting the conditions of anxiety and PTSD from the "severe" impairments at Step Two of his analysis. *Plaintiff's Brief* at 9-10.

At Step Two, an "impairment or combination of impairments ... [is] found 'not severe' and a finding of 'not disabled' is made ... when medical evidence establishes only a slight abnormality or [ ] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856,*3 (1985). "In the Sixth Circuit, the severity determination is 'a *de minimis* hurdle in the disability determination process.' " *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. February 22,

2008)(*citing Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1998)). "The goal of the test is to 'screen out totally groundless claims.' " *Id.* (*citing Farris v. Secretary of Health & Human Services*, 773 F.2d 85, 89 (6th Cir. 1985)).  Section §§ 404.1522(a) and 416.922(a)define a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities." See also SSR 85-28, supra, at *3. "Basic work activities" include the capacity for "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and, "[d]ealing with changes in a routine work setting." *Id.*

At Step Two, the ALJ found that  depression was a severe impairments but declined to find that the conditions of anxiety or PTSD were severe (Tr. 44).  Plaintiff's argument that the omission constitutes reversible error fails for multiple reasons.  The ALJ cited the mental health treating records from 2015 and 2016 noting Plaintiff's report that she was feeling good and had "no complaints" (Tr. 48).  The ALJ also cited the October, 2015 consultative examination finding that symptoms of anxiety and PTSD had resolved with medication (Tr. 48-49, 326).

While Plaintiff cites her own testimony that she left home only three times a month, had panic attacks around other people, and believed that some birds were trying to harm her, the ALJ provided ample reasons for discounting her testimony of extreme limitation, noting that she presented with a normal mood, affect, and manner at most of her treating appointments (Tr. 48).   He cited her self-report of "feeling good," "no complaints," and no

-19-

medication side effects (Tr. 48-49). His well-supported rejection of the subjective claims is entitled to "great weight." *See Cruse v. Commissioner of Social Security*, 502 F.3d 532, 542 (6th Cir. 2007)(*citing Walters v. Commission of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997)(ALJ's evaluation of the allegations of limitation entitled to deference). While Plaintiff referenced a panic attack requiring emergency treatment in 2012 (Tr. 324), none of the treating records note a panic attack, symptoms of anxiety, or exacerbation of PTSD symptoms during the relevant period.

Accordingly, substantial evidence supports the ALJ's finding that the conditions of anxiety and PTSD were non-severe.

Although Plaintiff has shown some degree of limitation resulting from the 2008 shooting, the ALJ's determination that she was capable of a limited range of unskilled sedentary work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI.  CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Docket #20] be GRANTED, and that Plaintiff's Amended Motion for Summary Judgment [Docket #16] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR

-20-

72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R.  Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  July 10, 2019

-21-

## CERTIFICATE OF SERVICE

I hereby certify on July 10, 2019, that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on July 10, 2019.